**Alex Boon**, OSB #195761
alex@nwjp.org
**D. Michael Dale**, OSB #771507
michael@nwjp.org
**Corinna Spencer-Scheurich**, OSB #130147
corinna@nwjp.org
Northwest Workers' Justice Project
310 SW Fourth Ave., Suite 320
Portland, OR 97204
Telephone: (503) 525-8454
Facsimile: (503) 946-3029
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **JANE DOE** and **JOHN ROE**, *individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>**TEACHERS COUNCIL, INC.**, *a foreign business corporation*,<br><br>Defendant. | Case No.: 3:23-cv-1747-AN<br><br>**PLAINTIFFS' RESPONSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>ORAL ARGUMENT REQUESTED |

## INTRODUCTION

Defendant Teachers Council, Inc. (hereinafter "Defendant") controls access to employment opportunities for teachers in Oregon, and other state as well. It chose to become a J visa sponsor. Under that program, teachers from foreign countries can come to the United States, after securing employment. Teachers that work under the J-1 program can only do so if they have a sponsor that is recognized by the Department of State. Sponsors have various obligations under the J visa program, including the duty to support teachers to ensure that they successfully

complete their stay, and the duty to have a detailed knowledge of local and state law. What's more important than a sponsor's duty, in this case, is a sponsor's power. Teachers in the program work with J-1 visas, and with those visas they are not (absent approval from the Attorney General) authorized to work without their sponsor's approval. Accordingly, a teacher that seeks to move from one employer to another can only do so with the approval of the sponsor; *i.e.*, sponsors have the power to exercise control over each employment opportunity that a J-1 teacher has under the program. But the sponsor's power does not stop with the J-1 teacher. Teachers often come to the United States with a partner, who gains entry under a J-2 visa through the sponsor. J-2 visa holders can obtain employment authorization and work only while the J-1 visa holder remains in the J visa program. If a sponsor chooses to unilaterally terminate a J-1 teacher's visa status, as happened here, the teacher loses her ability to lawfully work and remain in the United States under the program, as does the working J-2 visa holder.

In its brief, Defendant uses more than a few words to assert essentially that, Plaintiffs do not have a remedy in this Court for its decision to end their J visa statuses, and that this case is about a visa decision, and not an employment decision. That is all an attempt to escape liability; this case is about an employment decision. Defendant is a gatekeeper for each and every J visa holder that it sponsors that is authorized to work, each J-1 teacher and each J-2 visa holder that has employment authorization. That is particularly so with J-1 teachers, as they cannot change their employer unless the sponsor approves. Plaintiffs are not asking this Court to issue a visa, Plaintiffs are seeking a remedy for Defendant's refusal to allow them to work, because it unlawfully and incorrectly decided that Doe had a mental disability that prevented her from teaching. That was an abuse of Defendant's power.

///

## ARGUMENT

### I. This Court has Personal Jurisdiction over Defendant.

Defendant is subject to this court's jurisdiction. Defendant actively manages longstanding relationships it has with schools in Oregon, including by implementing a policy that prevents teachers, and prevented Doe in particular, from transferring from one of its client schools to another client school. "In opposing a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Gonzalez v. Maxon Indus.*, 3:21-cv-01844-AN, at 2 (D. Or. Mar 01, 2024). When the motion is decided based on the pleadings, "the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss," and "uncontroverted allegations in the plaintiff's complaint must be taken as true." *Gonzalez*, 3:21-cv-01844-AN, at 2. "When subject matter jurisdiction is based on diversity" as it is here, "the district court applies the law of the state in which the court sits." *Id.* at 1. "Oregon's long-arm statute permits this court to exercise personal jurisdiction within the limits of federal constitutional due process." *Id.* at 1.

The Ninth Circuit applies the "minimum contacts test" to determine if a court may assert specific jurisdiction over a non-resident defendant. That test has three parts: 1) the non-resident defendant must "purposefully direct" activities at the forum or a resident, or "purposefully avail" itself of the privilege of conducting activities in the forum; 2) the claim must arise out of or relate to the Defendant's forum-related activities; and 3) the exercise of jurisdiction must be "reasonable." *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 603 (9th Cir. 2018). The Plaintiffs bear the burden of satisfying the first two prongs, and if the plaintiff does so, the burden shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable." *Gonzalez*, 3:21-cv-01844-AN, at 4 (quotations omitted).

The inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quotations omitted).

Defendant has purposefully availed itself of the privilege of conducting business in Oregon. A purposeful availment analysis is "applicable in contract and other cases involving the conduct of business within a state." *See Freestream Aircraft*, 905 F.3d at 605 (quotations omitted). Purposeful availment requires "some type of affirmative conduct [by the Defendant] which allows or promotes the transaction of business within the forum state." *Gonzalez*, 3:21-cv-01844-AN at 4 (quotation omitted). The Supreme Court has cautioned that an out of state defendant's contract with a party in the forum state "alone" cannot "automatically establish sufficient contacts" in the forum state, as personal jurisdiction does not rest on "mechanical tests." *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 478 (1985) (quotations omitted). Rather, the Supreme Court has "emphasized the need for a highly realistic approach," that recognizes that a contract is ordinarily one step in a longer process, preceded by "prior negotiations" and followed by "future consequences." Those factors, as well as the terms of the agreement and the parties' course of dealing should be considered. *Burger King*, 471 U.S. at 478.

Jurisdiction is proper where the Defendant has created a "'substantial connection' with the forum State." *Id.* at 475 (citing *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957). While the Defendant's connection with the forum state should be more than "random, fortuitous, or attenuated," *Burger King*, 471 U.S. at 480 (quotation omitted), a "defendant whose interstate contract contemplates 'significant future consequences' in another state has the requisite continuing relationship with the parties to the contract in that state." *Gonzalez*, 3:21-cv-01844-AN, at 5 (citing *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991). "Similarly, a

defendant who created continuing obligations to residents of another state has satisfied the 'purposeful availment' requirement." *Id.* (citing *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

In this case, Defendant has created substantial connections with Oregon. Defendant created continuing obligations to Doe, and other J-1 teachers in Oregon, by agreeing to sponsor teachers in Oregon. In addition, Defendant has connections with Oregon schools such that it is required to actively manage its relationships with Oregon schools. Moreover, Defendant's decision regarding whether to allow a J-1 teacher to transfer from one Oregon school to another necessarily relates to its ongoing obligations to the Oregon teacher, as it did with Doe.

First, by agreeing to sponsor Doe, Defendant created ongoing obligations to her, and Defendant's choice to sponsor Doe necessarily contemplated future consequences in Oregon. The parties knew that Plaintiffs would live and work in Oregon. Defendant "made arrangements to secure Doe's employment in Oregon before Plaintiffs arrived to the United States, in the 2021-2022 and 2022-2023 school years. In both school years, Defendant knew that Doe would work in Oregon before she arrived to Oregon." First Amended Complaint, at ¶ 11. In making those arrangements, before Doe came to Oregon Defendant was required to (and presumably did) secure references regarding Doe's teaching skills and ensure that she was qualified to teach in Oregon. 22 C.F.R. § 62.24(e)(1–2); *id.* at (d)(1), (3). Further, by agreeing to sponsor Doe, Defendant undertook the obligation to provide ongoing support to her throughout the length of the program, as required by the J visa program's regulations. 22 C.F.R. § 62.11(b). In addition, by agreeing to sponsor Doe in Oregon, Defendant chose to undertake the obligation to ensure that it had a "detailed knowledge" of state and local law pertaining to employment. 22 C.F.R. § 62.11(a) (requiring that a sponsor's Responsible and Alternate officers have such knowledge).

Moreover, Defendant continuously sponsors other teachers that reside in Oregon. *E.g.*, First Amended Complaint, ¶ 64 ("We are currently sponsoring J-1 teachers at both schools"). By choosing to do so, under the above-described regulations it created continuing obligations to those Oregon teachers as well.

In addition, Defendant has also created ongoing obligations and connections to Oregon language immersion schools, and has chosen to manage its ongoing relationship with at least two Portland area schools by implementing a policy in which it refuses to support teacher transfers between those two schools. And, Defendant refused to allow Doe's transfer between those two schools. During Doe's employment at the host school in the 2021-2022 and 2022-2023 school years, a majority of the teachers at that school were sponsored by Defendant, and Defendant was one of only two sponsors at the host school. *Id.*, ¶ 46–47. Defendant has "a longstanding relationship" with the host school, which "has been one of Defendant's clients since around the time the host school was founded." *Id.*, ¶ 48. In around December 2022, Doe asked Defendant for permission to transfer from her host school to a French Language immersion school located in Portland, French International School of Oregon (hereinafter "FISO"). *Id.*, ¶ 49–50. Defendant refused to allow the transfer because it actively does business with both schools and sought to protect its relationship with its clients. Doe was in communication with Defendant's J-1 Program Director, Christina Friedrichsen, regarding Doe's transfer request. Doe also communicated with Friedrichsen regarding "problems with Doe's host school." *Id.*, ¶ 49 – 50. Defendant actively does business with the host school and FISO, and both schools are Defendant's ongoing clients and are based in the Porland metropolitan area. *Id.*, ¶ 51, 65. Friedrichsen initially attempted to steer Doe away from FISO, suggesting that Doe look outside of the city or even the state. *Id.*, ¶55. As of around December 14, 2022, Friedrichsen's reason for

doing so was based on her understanding that Doe belongs to a "small French Community" in Portland, and since Doe's host school and FISO are both in Portland and a friend of Doe's had transferred to FISO, "news may spread" and cause "drama and tension." *Id.* So, Friedrichsen suggested that Doe consider trying "a new city or state." *Id.*, ¶ 57. Then, on around February 6, 2022, Friedrichsen confirmed in an email that Defendant would not allow Doe to transfer to FISO to protect its relationships with the two schools:

> We will not approve a host school transfer to [FISO]. That decision is final. After further reviewing our partnership with [the host school] and our partnership with [FISO], and the nature of the two schools, it would be a conflict of interest to support teachers going from [the host school] to [FISO] or vice versa. We are currently sponsoring J-1 teachers at both schools. It could negatively impact the J-1 programs and J-1 teachers at both schools."

*Id.*, ¶ 64.

Finally, Defendant prevented Doe from working for yet another host school in Oregon, because it concluded that she was disabled. On around February 7, 2023, Doe experienced a mental health crisis. First Amended Complaint, ¶ 79. On around February 22, 2023, a second host school located in Multnomah County offered Doe a position as a French Teacher." *Id.*, ¶ 84. Defendant learned of the February 7 incident, and inaccurately concluded that Doe had a mental disability that prevented her from teaching at the new host school and on that basis it refused to grant her request for a transfer to that school. First Amended Complaint, ¶¶ 80–83, 91–96. Further, according to a March 2, 2023, letter written by Defendant, it would consider approving a transfer request for the 2023-2024 school year if Doe not only demonstrated an improvement to her "mental health," but also that she "let go of [her] anger with [the host school]," Defendant's client. First Amended Complaint, ¶ 94–96. In describing the nature of that commitment, Defendant wrote: "If you are to return to the US, you must demonstrate to us that you are willing to move on . . . . There can be no more . . . derogatory statements made towards [the host

school], or claims made against [the host school].” First Amended Complaint, ¶ 96. In other words, Defendant made it clear that refused to allow Doe to work on the basis of disability. And, it also demonstrated that it has an active, ongoing presence in schools in this state, and it makes efforts to ensure that its relationships with Oregon schools are ongoing, and continuous.

Defendant has purposefully availed itself of the privilege of conducting business in Oregon, it has “voluntarily derived some benefit from” its “interstate activities such that” it “will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.” *See Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023).

Plaintiffs were both deprived of employment opportunities (and in the case of Roe, employment as well) on account of Defendant’s forum-related activities. Under the second part of the minimum contacts test, the claim must arise out of or relate to the Defendant’s forum-related activities. *Freestream Aircraft*, 905 F.3d at 603. Plaintiff’s injuries arise out of Defendant’s contacts with Oregon. As described above, by agreeing to sponsor Doe in Oregon, Defendant chose to take on the obligation to provide her with ongoing support throughout the length of the program in Oregon, and to ensure that it possessed a detailed knowledge of applicable forum law relating to employment. *See* 22 C.F.R. § 62.11(b) (requiring that a sponsor’s Responsible and Alternative officers “[m]onitor that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of his or her exchange visitor program.”); 22 C.F.R. § 62.11(a) (requiring that the same officers have “a detailed knowledge of federal, state, and local laws pertaining to employment.”). Defendant fell short of that continuing obligation it owed to Doe in Oregon, and instead placed a premium on its relationships to its ongoing client schools in Oregon. As described above, Defendant actively manages its relationships with teachers and host schools in the Portland area, and refused to

allow Doe to transfer from one of its client schools to another client school to protect its ongoing relationships with its clients. Further, Defendant refused to allow Doe to transfer to yet another school in Oregon because it believed that she had a mental disability that prevented her from working as a teacher. In addition, in the March 2, 2023, letter to Doe, Defendant indicated that it might not sponsor her for any other positions in the future unless it was satisfied that she had improved her mental health, and stated that Doe "must demonstrate to us that you are willing to move on . . . . There can be no more . . . derogatory statements made towards [the host school], or claims made against [the host school]." First Amended Complaint, ¶ 96. In other words, Defendant's ongoing obligations to its host school in Oregon played a role in Defendant's decision to prevent Plaintiffs from remaining in their employment. In response to Defendant's March 2 letter, Plaintiffs reiterated Doe's "willingness to provide Defendant with medical documentation regarding Doe's ability to work as a teacher." First Amended Complaint, ¶ 98. Defendant ignored Doe's offers, First Amended Complaint, ¶ 114, informed her that it was terminating her J-visa status, and asserted that she and Roe needed to leave the United States by April 20, 2023. First Amended Complaint, ¶ 99. As a result, Roe lost his employment, which Defendant knew was in Multnomah County. First Amended Complaint, ¶ 102, 106. Plaintiffs' claims arise from Defendant's forum contacts.

Finally, Plaintiffs' injuries relate to Defendant's conduct. In accordance with Supreme Court precedent, a "plaintiff's injury relates to a defendant's forum contacts if similar injuries will tend to be caused by those contacts." *See Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 505 (9th Cir. 2023) (Discussing *Ford Motor Company v. Montana Eighth Judicial District Court*, 592 U.S.__, 141 S.Ct. 1017, 1029 (2021)). Also, "a plaintiff's injury relates to a defendant's forum contacts if the defendant should have foreseen the risk that its contacts might cause

injuries like that of the plaintiff." *Yamashita*, 62 F.4th at 506. It is fair to exercise jurisdiction over an out of state Defendant when the Defendant's forum contacts give rise to "an obligation to ensure that" its products or services will not harm residents of the forum state. *Id.* In *Ford*, the Defendant's "extensive marketing" of vehicles alleged to have caused harm in the forum state gave rise to that obligation, *id.*, "despite the vehicles having been sold by Ford out-of-state." *Id.* at 505. Here, Defendant has regular contact with Oregon J-1 teachers and the Oregon schools that employ them, to the point where it in at least one instance it has decided to adopt a policy of refusing to allow teachers to transfer between two of its client schools in the Portland area. First Amended Complaint, ¶ 64–65. This is so, even though Defendant has acknowledged that one of those client schools (Doe's former school) "has much to work on." First Amended Complaint, ¶ 61. Moreover, as described above, Defendant has a longstanding relationship with that host school, and the majority of teachers employed by that school are sponsored by Defendant. And again, Defendant has an ongoing obligation to support its Oregon teachers so that they successfully complete their tenure working under the J-1 program. 22 C.F.R. § 62.11(b). Because J-1 teachers are not authorized to work under the program without Defendant's approval, *see* 22 C.F.R. § 62.45(a) (defining unauthorized employment as any employment not authorized by the sponsor or the Attorney General), every J-1 teacher sponsored by Defendant that has legitimate concerns about his or her host school can only look to Defendant to secure a transfer under the program to another host school. Defendant has chosen to sponsor J-1 teachers in Oregon, and as such it has the power to end every Oregon teacher's ability to continue to work as a teacher under the program. When Defendant terminates its sponsorship of an Oregon teacher, that teacher and any of his or her family that reside in Oregon on derivative J-2 visas are faced with the choice of leaving the United States on little notice, *see* First Amended Complaint, ¶ 99 (when

Defendant informed Doe that it was ending her J-visa status it asserted that she and Roe needed to leave the United States in 30 days), or scrambling to find options to remain. As such, Defendant "should have foreseen the risk that its contacts might cause injuries like" those suffered by Plaintiffs. *Yamashita*, 62 F.4th at 506.

Under the Third part of minimum contacts test, Defendant has "the burden of presenting a compelling case that the presence of some other considerations would render jurisdiction [in the forum] unreasonable." *Freestream Aircraft*, 905 F.3d at 607. The Ninth Circuit uses a seven-factor balancing test to evaluate reasonableness, *Id.* Defendant has raised no argument and therefore has not met its burden. This Court has jurisdiction over Defendant.

**II. Plaintiffs have established venue in this Court.**

Defendant argues that under a provision of the Americans with Disabilities, as Amended ("ADAA"), 42 U.S.C. § 2000e-5(f)(3), Plaintiffs have not established venue in this Court. Under that provision, an action may be maintained "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed . . . or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(f)(3). In this case, when the discrimination occurred, Doe was seeking to secure a position in Multnomah County, First Amended Complaint, ¶¶ 84–85, and Roe was working in Multnomah County. First Amended Complaint, ¶ 102. Both Plaintiffs would have worked in Multnomah County but for Defendant's unlawful discrimination. Venue is proper. *See Johnson v. Payless Drug Stores Northwest, Inc.*, 950 F.2d 586, 588 (9th Cir. 1991) (holding that the proper venue under 42 U.S.C. § 2000e-5(f)(3) includes the place where the employment discrimination occurred or the place where the Plaintiff would have worked but for the alleged unlawful employment practice).

**III. Roe has standing.**

Roe has standing, as he alleges that he lost his employment because Defendant unlawfully discriminated against him and his wife, Doe, in violation of state and federal law. *See generally*, First Amended Complaint. To have standing, a Plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The ADAA contains an associational discrimination provision, under that provision, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association" constitutes unlawful discrimination. 42 U.S.C. § 121112(b)(4). *See also* ORS 659A.112(2)(d) (state-law associational discrimination provision). "In discrimination by association cases, courts have generally required that a plaintiff show a causal connection between the adverse employment action and her association with a disabled person." *Castro v. Classy, Inc.*, Case No.: 3:19-cv-02246-H-BGS, at 6 (S.D. Cal. Mar 02, 2020). *See also Marquard v. New Penn Fin., LLC*, Case No. 3:17-cv-549-SI (D. Or. Sep 22, 2017) (Plaintiff without a disability had standing to bring state disability discrimination claim when Plaintiffs alleged that Defendant unlawfully discriminated against her husband on the basis of disability and they were at risk of losing their home as result). Defendant contends that causation is not established, asserting that Defendant's "conduct at issue is actually and only the withdrawal of J-1 sponsorship, such that Roe's visa would terminate inevitably of its own terms," and adds that any harm Roe experienced is "is traceable exclusively to the effect on Doe by operation of visa law." Defendants Motion to Dismiss, at 10. However, Defendant's discrimination on the basis of

disability is the conduct at issue; if Defendant had not discriminated against Roe's wife, Roe would not have lost his employment. Roes' injury is traceable to Defendant.

Roe lost his employment because Defendant discriminated against his wife on the basis of disability. Defendant's assertion that Roe's damages are "traceable exclusively to the effect on Doe by operation of visa law" alludes to the reality in this case, which is that all of the harm that Plaintiffs suffered is related to the fact that they were only permitted to lawfully work under the J visa program with Defendant's continued sponsorship. But it was Defendant's abuse of that power; *i.e.*, unlawfully making employment decisions on the basis of disability, that brought this case to Court. Defendant chose to act as Plaintiffs' visa sponsor, and as such it had the unique power to determine whether they could continue to lawfully live and work in the United States under their J visas. Defendant knew that Roe was employed, that he was married to Roe, and that Roe believed that she was fit to teach and was being treated unfairly by Defendant. First Amended Complaint, ¶¶ 98 (describing contents of March 2, 2023 letter from Plaintiffs to Defendant). Defendant knew that Roe was employed when it decided to revoke its sponsorship of Doe, and knew that he would lose his employment as a result of its decision to revoke that sponsorship. First Amended Complaint, ¶¶ 101–106. As described above, Defendant believed that Plaintiff had a mental disability that prevented her from teaching. Roe has standing. *See Retail Prop. Trust v. United Bhd. of Carpenters*, 768 F.3d 938, 945 (9th Cir. 2014) ("In reviewing a motion to dismiss pursuant to Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party.").

///

///

**IV. Plaintiffs have shown an adverse action and Defendant is an Employment Agency.**

Plaintiffs allege that Defendant deprived Doe of employment opportunities on the basis of disability, and that Roe was deprived of his employment because of Defendant's unlawful discrimination. Being deprived of an employment opportunity is an adverse action, and being deprived of one's employment is as well. Under the Americans with Disabilities Act, as Amended, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Prohibited forms of discrimination include:

> (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;
> …
>
> (3) utilizing standards, criteria, or methods of administration—
>
> (A) that have the effect of discrimination on the basis of disability;
>
> (5) (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . .

42 U.S.C. § 12112(b)(1), (3)(A), (5)(A).

Doe applied for and received an offer of employment; she was unable to take the position because Defendant believed that she had a disability that prevented her from doing the job. Doe attempted to convince Defendant that she was qualified to teach, including by offering medical documentation that she was fit to teach. Defendant refused to consider that documentation. Defendant deprived Doe of an employment opportunity and barred her from future employment

opportunities through its program by terminating its sponsorship, because it believed that she had a disability that prevented her from teaching. Doe has suffered an adverse employment action. So has Roe, as the allegations in the First Amended Complaint are sufficient to support a conclusion, at this stage, that Defendant excluded or otherwise denied "equal jobs or benefits" to Roe "because of the known disability of an individual with whom" Roe was "known to have a relationship or association," his wife, Doe. 42 U.S.C. § 12112(b)(4).

Defendant is an employment agency. Defendant asserts that it is not an employment agency as that term is defined under the ADAA. Employment agencies are covered entities under the ADAA. 42 U.S.C. § 12111(2). The ADAA uses the definition for employment agency found in Title VII. 42 USC 12111(7). Under Title VII, an employment agency is defined as follows:

> The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

42 USC 2000e (c). *See also* ORS 659A.001 ("'Employment agency' includes any person undertaking to procure employees or opportunities to work."); ORS 659A.139 ("ORS 659A.103 to 659A.144 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended by the federal ADA Amendments Act of 2008 and as otherwise amended.").

In construing the scope of Title VII, the Ninth Circuit has "held that an entity that is not the direct employer of a Title VII plaintiff nevertheless may be liable if it interferes with an individual's employment opportunities with another employer." *The Assoc. of Mexican Am. Educators v. State*, 231 F.3d 572, 580 (9th Cir. 2000) (internal citations omitted). It is particularly appropriate to hold a non-employer Defendant liable when it exercises "considerable

power over [the Plaintiff's] ability to form employment relationships with third parties." *See Assoc. of Mexican Am. Educators*, 231 F.3d at 580. That is so, because to permit a covered entity

> to exploit circumstances particularly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*See Assoc. of Mexican Am. Educators*, 231 F.3d at 580.

In addition, the Ninth Circuit has determined that the definition of employment agency under Title VII is "evidence that Congress intended to close any loopholes in Title VII's coverage and to extend the statute's coverage to entities with actual control over access to the job market, whether or not they are direct employers." *Assoc. of Mexican Am. Educators*, 231 F.3d at 581.

Defendant is an employment agency. Defendant regularly undertakes to procure employment opportunities for employees. As alleged in Plaintiffs' First Amended Complaint, according to Defendant it provides employment opportunities to teachers. First Amended Complaint, ¶ 22. In addition,

> According to Defendant's website, as part of its Teacher Placement Program "it will utilize [its] network of school contacts in the USA to place [applicants] in the most appropriate school, facilitating multiple interviews when possible," and "upon successful placement" of a teacher as part of the placement Program Defendant charges an additional fee of $2,500, which job seekers pay in exchange for "securing an offer of employment."

First Amended Complaint, ¶ 25.

Further, Defendant regularly undertakes to procure employees for employers:

> "A 'School FAQ' page on Defendant's website states:
>
> 'Can Teachers Council find a qualified teacher to work at my school?
>
> Teachers Council is pleased to be able to offer teacher placement services for your school! Please reach out to us and we will discuss your school's specific teacher role

> needs. We will be able to present you with teacher profiles that match your job openings and then lead you and your chosen teacher through the process of obtaining a J-1 visa.'"

First Amended Complaint, ¶ 26.

Finally, the reality is that Plaintiffs, as well as other teachers sponsored by Defendant in Portland area schools, or elsewhere, depend on Defendant for their continued employment, as well as their ability to change employers. Defendant's reading of the statute would lead to a situation in which it could engage in discrimination on the basis of criteria prohibited by Congress despite the fact that it has "actual control over access to the job market." *See Assoc. of Mexican Am. Educators*, 231 F.3d at 581. Defendant is an employment agency.

**V. The state law claims should not be dismissed for lack of a supportive federal claim.**

Defendant contends that this Court should dismiss Plaintiffs' state law claims, if it dismisses all of Plaintiffs' federal claims. The Court should not dismiss Plaintiffs' federal claims and should exercise jurisdiction over their pendent claims, but in any event the Court has jurisdiction over Plaintiffs' state law claims under "28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and this action is between a citizen of a State and citizens or subjects of a foreign state." Complaint, ¶ 2.

Respectfully submitted this 15th day of March, 2024.

s/ Alex Boon
Alex Boon, OSB #195761
alex@nwjp.org
Northwest Workers' Justice Project
310 SW Fourth Ave., Suite 320
Portland, OR 97204
Telephone: (503) 525-8454
Facsimile: (503) 946-3029
*Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

I, Alex Boon, hereby certify that on the date below I caused to be served a true and correct copy of the foregoing document as follows:

Graham M. Sweitzer, OSB #025866
graham.sweitzer@harrang.com
HARRANG LONG P.C.
111 SW Columbia St., Suite 950
Portland, OR 97201
Telephone: (503) 242-0000
Facsimile: (541) 686-6564

Joel A. Ready, *pro hac vice*
joel@cornerstonelaw.us
Dominic Mayle, *pro hac vice forthcoming* (via email only)
dominic@cornerstonelaw.us
Cornerstone Law
519 Walnut Street
Reading, PA 19601
Telephone: 610-926-7875
Facsimile: 484-930-0054

Of Attorneys for Defendant TEACHERS COUNCIL, INC., a foreign business corporation

Via email and ECF

DATED: March 15, 2024

/s Alex Boon
Alex Boon, OSB 195761
alex@nwjp.org
Northwest Workers' Justice Project
310 SW 4th Ave, Ste. 320
Portland, OR 97204
Telephone: (503) 525-8454
Facsimile: (503) 946-3029