IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANE DOE and JOHN ROE,                          Case No.: 3:23-cv-01747-AN

              Plaintiffs,

     v.

                                   OPINION AND ORDER

TEACHERS COUNCIL, INC.,

              Defendant.

_____

Plaintiffs Jane Doe ("Doe") and John Roe ("Roe") bring this action against defendant Teachers Council, Inc., alleging employment discrimination in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and Oregon Revised Statute ("ORS") §§ 659A.103 *et seq.* On April 5, 2024, defendant filed this Motion to Dismiss, ECF [33]. After reviewing the parties' pleadings, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the following reasons, defendant's motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

### A.    Lack of Personal Jurisdiction

A party may move to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2). Federal courts may only decide cases over which they have statutory jurisdiction and where the exercise of jurisdiction comports with due process. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). When subject matter jurisdiction is based on diversity, the district court applies the law of the state in which the court sits. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006); *see* Fed. R. Civ. P. 4(k)(1)(A). Oregon's long-arm statute permits this Court to exercise personal jurisdiction within the limits of federal constitutional due process. *Gray & Co. v. Firstenberg Machinery Co., Inc.*, 913 F.2d

758, 760 (9th Cir. 1990) (per curiam) (citations omitted); *see* Or. R. Civ. P. 4(L).  Federal due process jurisprudence requires that a nonresident defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal citations omitted).

"In oppos[ing] a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citation omitted).  Courts may evaluate a defendant's motion by considering evidence presented in affidavits.  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  When the motion is assessed based on the pleadings and affidavits, rather than through an evidentiary hearing, "the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (citations omitted), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017).  Although a plaintiff may not rest solely on the bare allegations of their complaint, *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004), without an evidentiary hearing, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the parties' affidavit statements are resolved in the plaintiff's favor, *Doe*, 248 F.3d at 922.

**B.    Improper Venue**

A party may move to dismiss an action for improper venue pursuant to FRCP 12(b)(3).  Under the ADA, employment discrimination claims are brought under the specific venue provision contained in Title VII of the Civil Rights Act.  42 U.S.C. § 12117(a); *Johnson v. Payless Drug Stores Nw., Inc.*, 950 F.2d 586, 587 (9th Cir. 1991) (per curiam).  Under that provision, an action may be maintained

> "in any judicial district in the State in which the unlawful employment practice is alleged
> to have been committed . . . or in the judicial district in which the aggrieved person would
> have worked but for the alleged unlawful employment practice, but if the respondent is not
> found within any such district, such an action may be brought within the judicial district in
> which the respondent has his principal office."

42 U.S.C. § 2000e-5(f)(3).

**C.    Lack of Subject Matter Jurisdiction**

A party may move to dismiss an action for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1).  Pursuant to Article III of the U.S. Constitution, federal courts have limited jurisdiction to hear only live "cases" and "controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992); U.S. Const. art. III, § 2.  Accordingly, "Article III standing is a necessary component of subject matter jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  When a plaintiff lacks standing, dismissal under Rule 12(b)(1) is appropriate.  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

A motion to dismiss under Rule 12(b)(1) can attack the factual allegations establishing standing or can attack a plaintiff's standing facially.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id.* at 1121 (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

At the pleading stage, a plaintiff "must 'clearly . . . allege facts demonstrating' each element" of standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  Because a plaintiff need not satisfy *Iqbal/Tombly*'s plausibility standard under that posture, the inquiry does not touch directly on the merits of the plaintiff's case. *See Maya*, 658 F.3d at 1068 (contrasting consideration of a Rule 12(b)(1) motion with consideration of a Rule 12(b)(6) motion, the latter of which "necessarily assesses the merits of plaintiff's case").

**D.    Failure to State a Claim**

A party may move to dismiss an action for failure to state a claim pursuant to FRCP 12(b)(6).  To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

When evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). While the court must draw all reasonable inferences from the factual allegations in favor of the plaintiff, *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008), the court need not credit legal conclusions that are couched as factual allegations, *Iqbal*, 556 U.S. at 678-79.

E.     **Supplemental Jurisdiction**

A district court has supplemental jurisdiction over claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "A state law claim is part of the same case or controversy when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) (citation omitted). When a district court dismisses all claims independently qualifying for the exercise of federal jurisdiction, it ordinarily also dismisses all related state claims. *Artis v. Dist. of Columbia*, 583 U.S. 71, 74 (2018); *see* 28 U.S.C. § 1367(c)(3).

## BACKGROUND

A.     **Factual Background**

Plaintiffs are married French citizens who reside in Beaverton, Oregon. First Am. Compl. ("Compl."), ECF [26], ¶¶ 3, 9. Defendant is incorporated and has its principal place of business in Maryland. *Id.* ¶ 4.

1.     *J-1 Teacher Exchange Program*

Under the U.S. Department of State Exchange Visa Program for Teachers ("J-1 Teacher Exchange Program"), foreign teachers that meet certain eligibility requirements can come to the United States to work full-time as teachers on J-1 visas. *Id.* ¶ 12. Accompanying spouses can come to the United States on derivative J-2 visas. *Id.* ¶ 13. In the program, schools that employ J-1 teachers are referred to as "host schools." *Id.* ¶ 12. J-1 teachers may only secure employment under the J visa program with a sponsor recognized by the U.S. Department of State, and accompanying spouses may only secure J-2 visas with the approval of a recognized sponsor. *Id.* ¶ 14. After receiving a J-2 visa, an accompanying spouse can obtain authorization from the U.S. Department of Homeland Security to work in the United States. *Id.* ¶ 15. If a sponsor terminates a J-1 teacher's participation in the program, both the teacher and any derivative J-2 visa holder are no longer authorized to work in the United States. *Id.* ¶ 16. Additionally, a J-1 teacher can only transfer to a new host school with their sponsor's approval. *Id.*

As part of the J visa application process, sponsors are required to carefully screen J-1 teacher applicants to ensure that they are qualified to teach. *Id.* ¶ 39. Under 22 C.F.R. § 62.24(e), sponsors are required to verify that applicants: are qualified to teach in their home country; have at least two years of full-time teaching experience in their home country; have at least the equivalent of a U.S. bachelor's degree; satisfy the teaching eligibility standards of the U.S. state in which they will teach; and are of good character and reputation. *Id.* ¶ 40. The same rule requires that sponsors secure references from a colleague and former supervisor attesting to the visa applicant's good reputation, character, and teaching skills. *Id.* ¶ 41.

Under 22 C.F.R. § 62.9(g), sponsors are required to appoint a Responsible Officer and at least one Alternative Responsible Officer. *Id.* ¶ 69. Under 22 C.F.R. § 62.11(b), Responsible and Alternative Responsible Officers are required to "[m]onitor that the exchange visitor obtains sufficient advice and assistance to facilitate the successful completion of his or her exchange visitor program." *Id.* ¶ 70. Under 22 C.F.R. § 62.11(a), if the program has an employment component, Responsible and Alternative Responsible Officers that work with such a program are required to "have a detailed knowledge

of federal, state, and local laws pertaining to employment." *Id.* ¶ 71.

    2.   *Factual Allegations*

        Defendant is a designated sponsor of the J-1 Teacher Exchange Program. *Id.* ¶ 17. Defendant operates a "Teacher Placement Program," through which "it 'provides teachers with an opportunity' to 'work' while 'meeting an important need of their specific host school,' *i.e.*, the need for employees." *Id.* ¶¶ 25-26. According to defendant's website, as part of the placement program, defendant generates a "Placement Profile" for applicants who are willing to pay an application fee of $500; provides applicants with resume and interview assistance; and "utilize[s] [its] network of school contacts in the USA to place [applicants] in the most appropriate school, facilitating multiple interviews when possible[.]" *Id.* ¶¶ 27-29 (second and third alterations in original). "[U]pon successful placement" of a teacher, defendant charges an additional fee of $2,500, which applicants pay in exchange for "securing an offer of employment." *Id.* ¶ 29. Defendant also "offer[s] teacher placement services" to host schools by "present[ing] [schools] with teacher profiles that match [the school's] job openings and then lead[ing] [the school] and [its] chosen teacher through the process of obtaining a J-1 visa." *Id.* ¶ 30.

        Before plaintiffs came to the United States in August 2021, they applied for sponsorship for J visas with defendant. *Id.* ¶ 38. As part of the visa application process, defendant determined that Doe was qualified to teach. *Id.* ¶¶ 40-42. After Doe secured a job as a French teacher at a French immersion school ("the host school") in Portland, Oregon, defendant sponsored Doe's J-1 visa and Roe's derivative J-2 visa. *Id.* ¶¶ 10, 19, 44. Plaintiffs came to the United States on the defendant-sponsored J visas in or around August 2021. *Id.* ¶ 10. Doe worked as a French teacher at the host school from August 2021 until she was terminated on February 4, 2023, after a dispute involving pay. *Id.* ¶¶ 43, 45.

        During Doe's employment with the host school, defendant was one of two sponsors that provided the host school with French teachers that were foreign nationals working on J visas, and the majority of teachers at the host school were sponsored by defendant. *Id.* ¶¶ 46-47. Defendant and the host school have a longstanding relationship; the host school has been one of defendant's clients since around the time the school was founded. *Id.* ¶ 48.

Before Doe's termination from the host school, in around December 2022, Doe communicated with Christina Friedrichsen, defendant's J-1 Program Director and Responsible Officer, regarding problems with the host school and requested to transfer to the French International School of Oregon ("FISO"), another school in Portland that was also one of defendant's clients.  *Id.* ¶¶ 49-50, 76.  On December 5, 2022, Friedrichsen wrote that Doe would have to pay a "$300 host school transfer fee," which included "support during the interview process," before completing a transfer to another host school.  *Id.* ¶¶ 53-54.  Friedrichsen also provided guidance on how to draft a resume and interview for a position and asked if Doe would consider working outside of Portland or Oregon.  *Id.* ¶ 55.  On December 12, 2022, Doe responded that work at the host school was "complicated" and that teachers were angry at management and wanted to "leave."  *Id.* ¶ 56.  On December 14, 2022, Friedrichsen asked Doe if she intended to apply to FISO and indicated that if Doe were permitted to transfer to FISO, "news may spread through [Doe's] small French community and it could create extra drama and tension," which Friedrichsen sought to "avoid."  *Id.* ¶ 57.  On December 15, 2022, Doe stated plaintiffs' preference "to stay in Oregon for the moment"; indicated that she wanted to apply to the two other French schools in Portland, FISO and L'Etoile; and again indicated her concerns with the host school, including its issues with turnover.  *Id.* ¶ 58.  On December 29, 2022, Friedrichsen responded that she had "reached out to L'Etoile" and referred Doe for employment at the International School of Beaverton, but did not mention FISO.  *Id.* ¶ 59 (emphasis omitted).

After Doe's termination, on February 5, 2023, Friedrichsen emailed Doe confirming that she was aware that Doe's employment had been terminated by the host school.  *Id.* ¶ 60.  In that email, Friedrichsen wrote, "[w]e are fully aware of your complaints and grievances.  I understand [the host school] has much to work on, and it's something that we are actively reviewing."  *Id.* ¶ 61 (alterations in original).  Friedrichsen also wrote, "we can work with you to help you find another school," and confirmed that defendant would not allow Doe to transfer to FISO.  *Id.* ¶ 62.  Friedrichsen further wrote, "I think your preference is to teach French, but I believe your qualifications would allow you to teach normal elementary school too.  You could teach at a private school or a public school.  I believe you are eligible for an Oregon

state teaching license if needed." *Id.* ¶ 63.  On February 6, 2023, Friedrichsen again confirmed in an email that defendant would not allow Doe to transfer to FISO.  *Id.* ¶ 64.  Friedrichsen wrote, "[w]e will not approve a host school transfer to [FISO].  That decision is final.  After further reviewing our partnership with [the host school] and our partnership with [FISO], and the nature of the two schools, it would be a conflict of interest to support teachers going from [the host school] to [FISO] or vice versa.  We are currently sponsoring J-1 teachers at both schools.  It could negatively impact the J-1 programs and J-1 teachers at both schools." *Id.* (alterations in original)

On or around February 7, 2023, Doe was hospitalized for one night for treatment for a mental health crisis. *Id.* ¶ 79.  Defendant learned of the incident sometime before February 22, 2023.  *Id.* ¶ 80.

On or around February 22, 2023, another school in Multnomah County ("the new host school") offered Doe a position as a French teacher. *Id.* ¶ 84.  Under the rules of the J-1 Teacher Exchange Program, Doe could not accept the position at the new host school without defendant's approval. *Id.* ¶ 88. During a call on February 27, 2023, defendant informed Doe that it would not approve Doe's request for approval to work at the new host school because it believed she was mentally impaired. *Id.* ¶ 91.  Doe expressed her willingness and ability to provide defendant with a letter from a medical provider regarding her well-being and ability to teach. *Id.* ¶ 92.

In a letter to Doe dated March 2, 2023, Friedrichsen and defendant's Alternative Responsible Officers Judith Co, Nicholas Spagnolo, and Christina Rivas wrote: "[A]s discussed during a phone conversation with you on February 27, 2023 . . . [w]e do not feel comfortable placing you in a new school environment, which is likely to present new challenges and new stressors, so soon after the incident that took place on February 7, 2023." *Id.* ¶¶ 75, 77-78, 94 (second alteration in original).  Defendant also wrote that Doe had two options: "[r]eturn to France with a possibility of returning to the [United States]" in the 2023-2024 school year or "[e]nd [her] J-1 [t]eacher [p]rogram with [defendant]." *Id.* ¶ 95 (third and fourth alterations in original).  Defendant further wrote that before considering a transfer request, it would "like to see" Doe take "responsibility for [her] mental health" and make a "commitment to let go of [her]

anger with [the host school]." *Id.* ¶ 96 (alterations in original) (cleaned up). In describing the nature of that commitment, defendant wrote: "If you are to return to the US, you must demonstrate to us that you are willing to move on . . . . There can be no more . . . derogatory statements made towards [the host school], or claims made against [the host school]." *Id.* (alterations in original). In plaintiffs' response to the March 2 letter, Doe reiterated her willingness to provide medical documentation regarding her ability to work as a teacher, informed defendant that Doe had experienced stress as a result of the work environment at the host school and not due to working in a foreign school, requested that defendant authorize her transfer request, and requested that defendant inform Doe of any additional steps needed to gain approval. *Id.* ¶ 98.

In a letter to Doe dated March 20, 2023, defendant reiterated that it would not approve Doe's request to work for the new host school, informed her that it was ending her J-visa status on March 21, 2023, and asserted that plaintiffs needed to leave the United States on or before April 20, 2023. *Id.* ¶ 99. On March 20, 2023, defendant also informed Roe's employer, where Roe worked as a French teacher, that Roe was no longer authorized to work. *Id.* ¶¶ 101, 106.

On April 3, 2023, plaintiffs sent a copy of a letter from Doe's medical provider to defendant. *Id.* ¶ 112. The letter, dated March 22, 2023, expressed that Doe was at all relevant times capable of teaching and being responsible for the students in her class. *Id.* ¶ 113. To date, defendant has not indicated to plaintiffs any willingness to review any medical documentation that Doe has provided or offered to provide regarding her ability to work. *Id.* ¶ 114.

## B.    Procedural Background

On May 30, 2023, Doe submitted a disability discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") based on the facts alleged above. *Id.* ¶ 5. In a letter dated September 19, 2023, the EEOC notified Doe of her right to sue under federal law. *Id.* ¶ 6. On June 30, 2023, Roe submitted a disability discrimination complaint with the EEOC based on the facts alleged above. *Id.* ¶ 7. In a letter dated August 31, 2023, the EEOC notified Roe of his right to sue under federal law. *Id.* ¶ 8.

Plaintiffs initiated this action on November 27, 2023. Defendant filed a Motion to Dismiss,

ECF [17], on February 2, 2024. In response, plaintiffs filed an amended complaint on March 15, 2024. Defendant filed the instant Motion to Dismiss, ECF [33], on April 5, 2024. On June 17, 2024, the Court denied the first motion to dismiss as moot. Op. & Order of June 17, 2024, ECF [35].

## DISCUSSION

Defendant argues that plaintiffs' claims should be dismissed on five grounds: (1) the Court lacks personal jurisdiction over defendant; (2) venue is not proper in the District of Oregon; (3) Roe lacks standing; (4) plaintiffs fail to state a claim under the ADA or Oregon disability discrimination laws; and (5) because plaintiffs' federal claims fail, the Court should not exercise supplemental jurisdiction over plaintiffs' state law claims. The Court addresses these arguments in turn.

### A.    Personal Jurisdiction

Defendant's first argument for dismissal fails because the Court has specific jurisdiction over defendant. Personal jurisdiction may be established through general jurisdiction or specific jurisdiction. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). The parties agree that the Court does not have general jurisdiction over defendant. *See* Def. Mot. to Dismiss ("Def. Mot."), ECF [33], at 5-8; Pls. Resp. Opp'n Mot. to Dismiss ("Pls. Resp."), ECF [34], at 4. Thus, the sole inquiry is whether the Court may assert specific jurisdiction over defendant. This inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Walden v. Fiore*, 571 U.S. 277, 287 (2014)). This means that "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 284 (emphasis in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The analysis must look at the defendant's contacts with the forum state itself, as opposed to with persons who reside in the forum state. *Id.* at 285 (citations omitted).

The Ninth Circuit applies a three-part test, commonly referred to as the minimum contacts test, to determine if the exercise of specific jurisdiction over a nonresident defendant is appropriate:

"(1) The non-resident defendant must purposefully direct his activities or consummate

some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable."

*Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 603 (9th Cir. 2018) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden of satisfying the first two prongs. *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). The burden of satisfying the third prong then shifts to the defendant to present "a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539 F.3d at 1016 (quoting *Burger King*, 471 U.S. at 476-78).

1.   *Purposeful Direction*

The first prong embodies two distinct, although sometimes conflated, concepts: purposeful availment and purposeful direction. *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010), *abrogated on other grounds by Walden*, 571 U.S. at 1124-25; *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006). "A purposeful availment analysis is most often used in suits sounding in contract. A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802 (citations omitted). Plaintiffs have alleged employment discrimination claims against defendant. Because plaintiffs' claims sound in tort, the purposeful direction test applies. *See Bailey v. DynCorp Int'l FZ-LLC*, No. 3:11-CV-00714-KI, 2012 WL 112867, at *4 (D. Or. Jan. 11, 2012) (citing *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 474 (9th Cir. 1995)) (characterizing employment retaliation claim as tort claim and analyzing it for purposeful direction).

A court evaluates purposeful direction under the effects test delineated in *Calder v. Jones*, 465 U.S. 783 (1984). *E.g.*, *Yahoo! Inc.*, 433 F.3d at 1206. Under *Calder*, purposeful direction exists if the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo*, 647 F.3d at 1228 (internal citations and quotation marks omitted).

a.     Intentional Act

Courts "construe 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806.  An "act" is "an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." *Id.* (citing Restatement (Second) of Torts § 2 (1964)).  In the context of employment discrimination, intentional acts include "hiring, employment, alleged discrimination, and termination[.]" *Franey v. Am. Battery Sols. Inc.*, No. 22-cv-03457-LB, 2022 WL 4280638, at *7 (N.D. Cal. Sept. 15, 2022) (internal quotation marks omitted) (quoting *Mercado v. JMJ Assocs. LLC*, No. SACV 14-2060-JLS (RNBx), 2015 WL 13783452, at *3 (C.D. Cal. Apr. 15, 2015)).

Plaintiffs allege that defendant "placed" or facilitated Doe's employment at the host school and sponsored her J visa.  Plaintiffs allege that defendant sent letters to Doe dated March 2, 2023, and March 20, 2023, in which it denied her request to work for the new host school and informed her that it was ending her J-visa status on an allegedly discriminatory basis.  Plaintiffs also allege that defendant called Roe's employer about its termination of plaintiffs' visa statuses.  Such acts are intentional.  *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) (holding that the defendant acted intentionally by sending a letter to the plaintiff), *overruled in part on other grounds by Yahoo!*, 433 F.3d 1199 (9th Cir. 2006).  Accordingly, the first prong of the test is satisfied.

b.     Express Aiming

The express aiming "requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft & Masters*, 223 F.3d at 1087.

Plaintiffs allege that defendant individually targeted each of them by sending the letters to Doe and calling Roe's employer.  Plaintiffs also allege that defendant knew plaintiffs were living and working in Oregon when defendant committed these acts.  *See id.* at 1088 (holding that the defendant's letter was expressly aimed at the forum state because defendant individually targeted the plaintiff, a

California corporation doing business almost exclusively in California). Defendant argues that plaintiffs do not establish that it expressly aimed itself at Oregon because defendant's business in Oregon is purely reactive and its contracts and payments are made outside the state. However, defendant appears to confuse "express aiming" with a "purposeful availment" analysis. Specific jurisdiction applies when the defendant's *suit-related* conduct is expressly aimed at the forum state. Thus, the relevant question here is whether defendant targeted plaintiffs individually and knew plaintiffs to be Oregon residents when defendant engaged in the alleged discrimination, sent the letters to Doe, and made the call to Roe's employer. *See id.* Based on plaintiffs' allegations, the answer is yes. Accordingly, the second prong of the test is satisfied.

> c.     Harm Likely to Be Suffered in the Forum State

Finally, plaintiffs allege that they experienced the effects of defendant's communications in Oregon, as defendant knew they would. The alleged injury in the form of Doe's loss of an employment opportunity and Roe's termination were foreseeable results of defendant's acts based on the structure of the J-1 Teacher Exchange Program. Although defendant argues that it made its decisions in Maryland, it was also foreseeable that plaintiffs' alleged injury would occur primarily, if not solely, in Oregon, where plaintiffs worked and lived. *See Bailey*, 2012 WL 112867, at *5 (finding that relevant harm analyzed in third prong of effects test was loss of employment and that the plaintiff's "injury occurred in [the location] where she was no longer employed"). Accordingly, the third prong of the test is also satisfied.

Because plaintiffs have alleged that defendant committed an intentional act expressly aimed at Oregon that caused harm that defendant knew was likely to be suffered in Oregon, plaintiffs have demonstrated purposeful direction under the effects test.

> 2.     *Forum-Related Activities*

While defendant's contacts show that it purposefully directed its activities to the forum, defendant "cannot be subject to personal jurisdiction . . . unless [plaintiffs'] injuries 'arise out of or relate to' those contacts." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)). An injury arises out of or relates to the defendant's forum activities where there is "but for" causation, *i.e.*, where "a direct nexus exists between [a defendant's]

13

contacts [with the forum state] and the cause of action." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013))

Plaintiffs allege four types of contacts: (1) defendant's facilitation of Doe's employment in Oregon and sponsorship of Doe through the J-1 Teacher Exchange Program; (2) defendant's relationships with Oregon host schools; (3) the March 2, 2023 and March 20, 2023 letters relaying defendant's decisions to deny Doe's transfer request and terminate Doe's J visa; and (4) the call to Roe's employer. None of these contacts caused Doe's termination on February 4, 2024, because that was an independent act committed by the host school, not by defendant. However, plaintiffs also allege that because of defendant's alleged disability discrimination, defendant refused to approve Doe's transfer to the new host school, which had already offered Doe a position as a French teacher, and thus deprived Doe of an employment opportunity. Plaintiffs argue that but for defendant's unlawful employment practice, Doe would have worked at the new host school, and Roe would have continued his employment.

Defendant argues that its decisions to deny Doe's transfer request and terminate sponsorship of plaintiffs' visas are not forum contacts out of which plaintiffs' alleged injuries could have arisen because those decisions were absences of action, not affirmative acts. Defendant further argues that plaintiff did not plead any theory of relatedness that would demonstrate a forum connection. Specifically, defendant argues that plaintiffs do not show that "similar injuries will tend to be caused by [defendant's] contacts [with the forum]" or that "the defendant should have foreseen the risk that its contacts might cause injuries like that of the plaintiff." *See Yamashita*, 62 F.4th at 505-06. Lastly, defendant argues that the contact of facilitating Doe's teaching employment did not make discrimination likely because defendant did not know of Doe's alleged disability at the time of placement, and that disability discrimination, could not have been foreseeable because plaintiffs did not tell anyone of Doe's disability.

Defendant's arguments are unavailing. While the first, second, and fourth contacts that plaintiffs allege may not be but for causes of plaintiffs' alleged injuries, the third is. Under the J-1 Teacher Exchange Program, defendant's denial of the transfer request meant that Doe could not accept the position

at the new host school. Defendant's decision to terminate its sponsorship of Doe on an allegedly discriminatory basis also meant that plaintiffs could not remain employed in the United States. These decisions constitute acts, and but for these acts, Doe would have worked at the new host school, and Roe would have continued his employment. Accordingly, plaintiffs have alleged that their injuries arose out of or are related to defendant's contacts with the forum.

        3.     *Reasonableness*

Because plaintiffs have met their burden of satisfying the first two prongs, the burden shifts to defendant to put on "a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger*, 374 F.3d at 802). For jurisdiction to be reasonable, it must comport with fair play and substantial justice. *See Burger King Corp.*, 471 U.S. at 476. The reasonableness determination requires the consideration of several specific factors: (1) the extent of the defendant's purposeful direction into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. *See id.* at 476-77.

Defendant has not argued that jurisdiction is unreasonable, let alone attempted to make a factual showing to establish unreasonableness. Accordingly, defendant has not established that the exercise of jurisdiction would be unreasonable. *See Bancroft & Masters*, 433 F.3d at 1089 (holding that the defendant did not establish unreasonableness where it "stated without elaboration that jurisdiction would be unreasonable" and "attempted no factual showing with regard to the *Burger King* factors.").

For the foregoing reasons, the Court has specific jurisdiction over defendant.

**B.**    **Venue**

Defendant's second argument for dismissal fails because venue is proper in the District of Oregon. In ADA employment discrimination cases, if the defendant is not to be found within the district where the alleged discrimination occurred or where the plaintiff would have worked but for that

discrimination, the action is to be maintained in the district of the defendant's principal place of business. 42 U.S.C. § 2000e-5(f)(3). "A corporation is 'found' within a district for venue purposes if it is subject to personal jurisdiction in that district." *Harrison v. Int'l Ass'n of Machinists & Aerospace Workers*, 807 F. Supp. 1513, 1516 (D. Or. 1992) (quoting *Found*, Black's Law Dictionary (5th ed. 1979)).

Defendant argues that it is not "found" in the District of Oregon because it is not subject to personal jurisdiction there, and that under section 2000e-5(f)(3), venue is only proper in the District of Maryland, where defendant is subject to general jurisdiction. However, as explained above, the Court has specific personal jurisdiction over defendant. Defendant is thus "found" in the District of Oregon for venue purposes. Additionally, plaintiffs allege that they would have worked in Oregon but for defendant's alleged discrimination. Because defendant is "found" within the district where plaintiffs would have worked but for that discrimination, venue is proper in the District of Oregon.

## C.      Roe's Standing

Defendant's third argument for dismissal fails because Roe has associational standing. To establish Article III standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61). When "standing is challenged on the basis of the pleadings," a court must "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party[.]" *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (internal citations and quotation marks omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal citation and quotation marks omitted).

A court shall "take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits are the primary method of obtaining compliance with

the Act." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008) (internal citations and quotation marks omitted). The ADA and Oregon disability discrimination laws both contain an explicit associational standing provision. The ADA prohibits a covered entity from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association[.]" 42 U.S.C. § 12112(b)(4). Oregon law similarly prohibits an employer from "exclud[ing] or otherwise den[ying] equal jobs or benefits to a qualified individual because the individual is known to have a relationship or association with an individual with a disability." Or. Rev. Stat. § 659A.112(2)(d).

Here, it is undisputed that plaintiffs have established the first and third elements of Roe's standing: Roe alleges that he was terminated from his job, which is a concrete, actual injury, and a judicial decision in plaintiffs' favor would likely redress Roe's injury. Defendant makes a facial attack on Roe's standing, arguing that plaintiffs' allegations do not establish causation. To establish causation, plaintiffs must allege that Roe's injuries are "fairly traceable" to defendant's conduct and "not the result of the independent action of some third party not before the court." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094 (9th Cir. 2020) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 560). Plaintiffs must thus allege a "substantial probability" that defendant caused Roe's alleged harm. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 452-53 (9th Cir. 2021) (internal quotation marks omitted).

Defendant argues that plaintiffs cannot show a causal connection between Doe's disability and Roe's alleged injury. Defendant argues that the only act that plaintiffs allege was directed at Roe is the phone call to Roe's employer and that Roe's termination is traceable only to the U.S. government by operation of visa law. Plaintiffs argue that if defendant had not unlawfully discriminated against Doe because of her perceived disability, defendant would not have discontinued plaintiffs' visas and Roe would not have lost his employment. Therefore, plaintiffs argue that because they allege that defendant discriminated against Doe because of her disability and against Roe because of his association with Doe, Roe has associational standing.

Plaintiffs allege that if a sponsor terminates a J-1 teacher's visa, the teacher and any

derivative J-2 visa holders are no longer authorized to work in the United States, and that all J-2 visa holders who are sponsored by defendant thus necessarily depend on defendant for their continued employment. Compl. ¶¶ 16, 104. Plaintiffs allege that defendant knew that Roe would lose the ability to remain and work in the United States if defendant terminated Doe's visa. *Id.* ¶ 103. Plaintiffs further allege that Roe was injured when defendant deprived him of his employment by terminating Doe's visa and, consequently, Roe's derivative visa and work authorization. *See id.* ¶¶ 16, 110-111. Plaintiffs argue that because Roe's work authorization was contingent on defendant's sponsorship of Doe's J-1 visa, Roe's alleged injury would not have occurred absent defendant's allegedly discriminatory decision to not continue sponsoring Doe's visa. *See Namisnak*, 971 F.3d at 1094. Because plaintiffs allege that Roe's alleged injury is "fairly traceable" to defendant's allegedly discriminatory act and that there is a "substantial probability" that defendant caused the harm alleged, plaintiffs' allegations establish that Roe has associational standing.

**D.    Disability Discrimination**

Defendant's fourth argument for dismissal fails as to Doe because she plausibly states a disability discrimination claim under the ADA and Oregon law. However, Roe's claims are dismissed because he does not plausibly state an associational disability discrimination claim.

Title I of the ADA prohibits a "covered entity," *i.e.*, "an employer, employment agency, labor organization, or joint labor-management committee," from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. §§ 12112(a), 12111(2). Oregon law makes it unlawful "for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment on the basis of disability." Or. Rev. Stat. § 659A.112(1). Oregon law also makes it unlawful "for an employment agency to fail or refuse to refer for employment, or otherwise discriminate against, any individual because that individual has a disability, or to classify or refer for employment any individual because that individual has a disability." *Id.* § 659A.142(2).

The standard for establishing a *prima facie* case of disability discrimination is identical under federal and Oregon law; thus, the Court considers these claims together. *Snead v. Metro. Prop. &*

*Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001); *see* Or. Rev. Stat. § 659A.139(1) (providing that state disability discrimination statute should be construed "to the extent possible in a manner that is consistent with any similar provisions of the [ADA]"). To state a *prima facie* claim for disability discrimination, a plaintiff must show that: "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (internal alterations and quotation marks omitted); *see Huitt v. Optum Health Servs.*, 216 F. Supp. 3d 1179, 1187 (D. Or. 2016) (citations omitted) ("To establish a *prima facie* case of discrimination under [Oregon law] the plaintiff must show: (1) she is a qualified individual with a disability, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and her disability."); *Giddens v. Mesquite Gaming LLC*, No. 2:17-cv-00922-GMN-VCF, 2017 WL 8728163, at *2 (D. Nev. Apr. 25, 2017) (citations omitted) ("To sustain an 'association discrimination' claim under the ADA a plaintiff must allege sufficient facts in his or her complaint to show that (1) the plaintiff was 'qualified' for the job at the time of the adverse employment action; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.")

The parties do not dispute that plaintiffs plausibly allege that Doe was qualified to work as a teacher at all relevant times. *See* Compl. ¶¶ 39-42, 63, 67, 113. Defendant argues that plaintiffs fail to state a disability discrimination claim under the ADA or Oregon law because defendant is not a "covered entity" and plaintiffs have not alleged a disability or an adverse employment action.

1.    *Covered Entity*

As an initial matter, defendant argues that it is not an employer or employment agency to which disability discrimination laws apply. The Court agrees that defendant is not a covered entity with respect to Roe. However, plaintiffs plead sufficient facts to establish that defendant acted as an employment

agency with respect to Doe.

The ADA uses the definition for "employment agency" found in Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 12111(7). Under Title VII, an employment agency is defined as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." *Id.* § 2000e(c); *see also* Or. Rev. Stat. § 659A.001(5) ("'Employment agency' includes any person undertaking to procure employees or opportunities to work.").

In construing the scope of Title VII, the Ninth Circuit has "held that an entity that is not the direct employer of a Title VII plaintiff nevertheless may be liable if it 'interferes with an individual's employment opportunities with another employer.'" *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 580 (9th Cir. 2000) (internal citation and quotation marks omitted). The court noted that it is particularly appropriate to hold a non-employer defendant liable when it exercises "considerable power over [a plaintiff's] ability to form employment relationships with third parties." *Id.* That is because:

> "[t]o permit a covered employer to exploit circumstances particularly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited."

*Id.*

Accepting well-pleaded material facts as true and construing them in the light most favorable to plaintiffs, plaintiffs plausibly allege that defendant is an employment agency because it procures for prospective employees opportunities to work for a host school employer through its "Teacher Placement Program." *See* 42 U.S.C. § 2000e(c); Compl. ¶¶ 26-33. Although defendant argues that it does not "place" teachers but merely "facilitates visa entry into the United States for teaching opportunities," defendant acknowledges that it "prepared an application package for Doe to apply with to prospective employers, served as a mediator for interviews, reviewed her application materials, and helped her practice." Def. Mot. 17-18. From defendant's own website, defendant promises to "utilize [its] network of school contacts in the USA to place [applicants] in the most appropriate school, facilitating multiple

interviews when possible[.]"  Compl. ¶ 29 (alterations in original).  Defendant also indicates that it "offer[s] teacher placement services" to host schools by "present[ing] [schools] with teacher profiles that match [the school's] job openings and lead[ing] [the school] and [its] chosen teacher through the process of obtaining a J-1 visa."  *Id.* ¶ 30.  The fact that Doe ultimately located a new employer after she was sponsored without relying on defendant does not rebut the allegations that defendant is primarily in the business of procuring for applicants opportunities to work at host schools.

Moreover, the Ninth Circuit's reasoning in *Association of Mexican-American Educators* that entities that are not direct employers may still be liable if they interfere with an individuals' employment opportunities with another employer is persuasive.  *See* 231 F.3d at 580.  Although *Association of Mexican-American Educators* was a Title VII case, the ADA uses the same definition of "employment agency" found in Title VII, and the scope of that definition is at issue here.  Plaintiffs allege that defendant refused to approve Doe's transfer request and that under the terms of the J-1 Teacher Exchange Program, Doe could not work at the new host school without defendant's approval of her transfer request.  *Id.* ¶¶ 64, 88.  Plaintiffs thus plausibly show that defendant holds "considerable power over [Doe's] ability to form employment relationships with [other host schools]" and that it interfered with Doe's ability to accept a position at the new host school by refusing to approve her transfer request.  *See Ass'n of Mexican-Am. Educators*, 231 F.3d at 580.

Because defendant regularly undertakes to procure employment opportunities at host schools for applicants, *see* 42 U.S.C. § 2000e(c), and holds considerable power over Doe's ability to form employment relationships with other host schools, *see Ass'n of Mexican-Am. Educators*, 231 F.3d at 580, plaintiffs plausibly allege that defendant is acting as an employment agency with respect to Doe.

However, plaintiffs do not plausibly allege that defendant acted as a covered entity with respect to Roe.  Plaintiffs allege only that defendant sponsored Roe's J-2 visa derived from Doe's J-1 visa.  *See* Compl. ¶ 19.  However, just because defendant sponsored Roe's derivative J-2 visa does not mean that defendant employed Roe, facilitated Roe's employment, or procured for Roe any employment opportunities in the United States.  Moreover, defendant's only act with respect to Roe was its call to Roe's employer

relaying the fact that Roe no longer had work authorization. *See id.* ¶ 106. This act did not cause Roe's termination; rather, his lack of a visa and work authorization (albeit because of defendant's allegedly discriminatory decision) did. Unlike with Doe, defendant had no authority to remove Roe from or otherwise interfere with his employment. Because plaintiffs do not allege that defendant acted as an employer or employment agency with respect to Roe, Roe fails to state a claim of associational disability discrimination.

      2.    *Existence of a Disability*

      Turning to Doe's *prima facie* case of disability discrimination, plaintiffs plead sufficient facts to plausibly allege that defendant regarded Doe as having a disability.

      The ADA defines a "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). An individual is "'regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Equal Emp. Opportunity Comm'n v. BNSF Ry. Co.*, 902 F.3d 916, 922 (9th Cir. 2018) (alteration in original) (quoting 42 U.S.C. § 12102(3)(A)). However, the "regarded as" definition of disability does "not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of [six] months or less." 42 U.S.C. § 12102(3)(B).

      Plaintiffs allege that in the March 2, 2023 letter to Doe, defendant wrote that it did "not feel comfortable placing [Doe] in a new school environment, which is likely to present new challenges and new stressors, so soon after" Doe's hospitalization for a mental health crisis on February 7, 2023. Compl. ¶ 94. Plaintiffs allege that in the same letter, defendant stated that it also wanted Doe to "take 'responsibility for [her] mental health'" and "let go of [her] anger with [the host school]" before it would consider approving a transfer request for the 2023-2024 school year. *Id.* ¶ 96 (alterations in original) (cleaned up). Plaintiffs thus plead facts showing that defendant perceived Doe to have a mental impairment and would not approve Doe's transfer request, until Doe treated or otherwise "t[ook] responsibility for" such impairment.

Accordingly, plaintiffs plausibly allege the existence of a disability.

Defendant also fails to meet its burden to establish that the "transitory and minor" exception applies. Defendant argues that "any impairment clearly was transient: it comprises a one-day hospital stint followed by Doe's insistence that she *could teach* and *wanted to teach*. Since [p]laintiffs do not show any impairment of a major life activity, a diagnosis that could impair such an activity, or any medical conclusion regarding a persistent disability, anything that happened to her is clearly 'minor.'" Def. Mot. 20 (emphases in original). However, as plaintiffs argue, "[t]he 'transitory and minor' exception is an affirmative defense, and '[a]s such, the employer bears the burden of establishing the defense.'" Pl. Resp. 24 (second alteration in original) (quoting *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 435 (9th Cir. 2018)). Additionally, the relevant issue is not whether plaintiffs plausibly allege that Doe *actually* had an impairment or a record of such impairment, but whether plaintiffs plausibly allege that defendant *regarded* Doe as having such impairment. As described above, plaintiffs do, and defendant fails to sustain its burden that Doe's perceived impairment was "transitory and minor." Furthermore, the facts as alleged raise the reasonable inference that defendant perceived that Doe's impairment would last longer than six months because defendant conditioned its approval of Doe's transfer request for the following academic year on Doe's "tak[ing] responsibility for [her] mental health[.]" *See* Compl. ¶¶ 94-96 (alteration in original) (internal quotation marks omitted). Accordingly, defendant has not established that the "transitory and minor" exception applies.

3.    *Adverse Employment Action Because of Doe's Disability*

Plaintiffs argue that "[d]efendant deprived Doe of employment opportunities on the basis of disability," and "[b]eing deprived of an employment opportunity is an adverse [employment] action[.]" Pl. Resp. 18. Defendant argues that it was not responsible for the host school's termination of Doe, and defendant's decision to discontinue its sponsorship of Doe's visa is not an adverse employment action because "foreign-relations, visa-based actions simply were not contemplated as part of any employment-discrimination remedy." Def. Mot. 15.

The Ninth Circuit "take[s] an expansive view of the type of actions that can be considered

23

adverse employment actions" such that "a wide array of disadvantageous changes in the workplace constitute adverse employment actions." *Ray v. Henderson*, 217 F.3d 1234, 1240-41 (9th Cir. 2000). "An adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Siring v. Or. State Bd. of Higher Educ.*, 977 F. Supp. 2d 1058, 1063 (D. Or. 2013) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928-29 (9th Cir. 2000)). "[A]n ADA discrimination plaintiff bringing a claim under 42 U.S.C. § 12112 must show that the adverse employment action would not have occurred but for the disability." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019).

Plaintiffs appear to allege two actions as part of defendant's deprivation of Doe's employment opportunity because of Doe's disability: (1) defendant's denial of Doe's request to transfer to the new host school, and (2) defendant's decision to discontinue its sponsorship of Doe's J-1 visa. *See* Compl. ¶¶ 91, 97, 99-100; Pl. Resp. 18-19.

a.      Denial of Transfer Request

Defendant's denial of Doe's transfer request to work at the new host school is an adverse employment action. Under the terms of the J-1 Teacher Exchange Program, Doe could not accept the position at the new host school without defendant's approval. Compl. ¶ 88. Therefore, defendant's decision to deny Doe's transfer request effectively denied Doe the ability to accept and be hired into an employment opportunity.

Accepting well-pleaded material facts as true and construing them in the light most favorable to plaintiffs, plaintiffs also plausibly allege that defendant's denial of Doe's transfer request was because of Doe's disability. Plaintiffs allege that Doe was hospitalized for one night for treatment for a mental health crisis on February 7, 2023, and that defendant learned of her hospitalization sometime before February 22, 2023. *Id.* ¶¶ 79-80. The new host school offered Doe a position as a French teacher on February 22, 2023, and communicated to defendant regarding Doe's position the next day. *Id.* ¶¶ 84, 89. On February 27, 2023, defendant informed Doe that it would not approve Doe's transfer request to work at the new host school because it believed that she was mentally impaired. *Id.* ¶ 91. In the March 2, 2023 letter, defendant stated that it "d[id] not feel comfortable placing [Doe] in a new school environment . . . so

soon after" her hospitalization on February 7, and conditioned its approval of Doe's transfer request on her "tak[ing] responsibility for [her] mental health[.]"  *Id.* ¶¶ 94, 96 (second alteration in original) (internal quotation marks omitted).  Plaintiffs thus plausibly allege that defendant regarded Doe as having a mental impairment after her hospitalization and that but for defendant's regarding Doe as having an impairment, defendant would not have denied her transfer request.  Accordingly, plaintiffs plausibly allege that defendant denied Doe's transfer request because of Doe's disability.

    b.  Decision to Discontinue Visa Sponsorship

    As an initial matter, defendant appears to offer a quasi-sovereign immunity, consular nonreviewability, or political question argument, arguing that its decision to not continue sponsoring Doe's visa is not actionable because "[d]ecisions regarding the admission and exclusion of foreign nationals are a fundamental sovereign attribute exercised by the Government's political departments[,]" not the judiciary.  Def. Mot. 16 (internal quotation marks omitted) (quoting *Khachatryan v. Blinken*, 4 F.4th 841, 849 (9th Cir. 2021)).  Defendant also argues that it "collaborates as a delegate in this sovereign function" and that "[e]ffectively, the U.S. Departments of State and Homeland Security are delegating part of their sovereign function to [defendant] as an instrument of their diplomatic objectives."  *Id.* at 16-17.  Defendant further asserts that "[its] withdrawal of continued sponsorship was not an employment-related action but a diplomatic action."  *Id.* at 16.

    None of these arguments, to the extent that defendant offers them, hold merit.  Under the doctrine of sovereign immunity, the United States is immune from suit unless it waives that immunity.  *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011).  Sovereign immunity extends to federal agencies and federal employees acting in their official capacities.  *Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) (citations omitted).  However, to the extent that defendant offers a quasi-sovereign immunity argument, defendant is not an agency or officer of the United States, nor does it assert that it is.  Defendant argues instead that it is "a delegated agent of the Government" and "a designated surrogate of [the United States'] diplomatic mission."  Def. Mot. 15-16.  This proposition is tenuous at best, but even assuming that defendant is a "delegated agent" of the United States, the type of derivative sovereign

immunity it attempts to assert would only apply where the United States "authorized and directed" defendant to take the specific actions at issue. *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940) (collecting cases); *Posada v. Cultural Care, Inc.*, 66 F.4th 348, 363 (1st Cir. 2023) (quoting *Yearsley*, 309 U.S. at 20) (holding that sponsor of J visa program for au pairs was not entitled to protection under *Yearsley* because it did not show "that any of the plaintiffs-appellees' claims . . . seek to hold it liable for taking actions that the Government 'authorized and directed.'"). That is not the case here. Defendant decided to become a sponsor organization and operate a Teacher Placement Program under the terms of the J-1 Teacher Exchange Program. Defendant does not assert that the United States "authorized and directed" its allegedly discriminatory conduct at issue here, only that defendant "collaborates" with the United States and has been delegated the function of sponsoring visas. *See* Def. Mot. 15-16. Therefore, even assuming that the protections of *Yearsley* would extend to these circumstances—which is questionable, *see Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (citation omitted) ("[D]erivative sovereign immunity, as discussed in *Yearsley*, is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'")—defendant does not establish that it benefits from such protection such that its allegedly discriminatory decision to discontinue its sponsorship of Doe's visa is immune from judicial review. Accordingly, this quasi-sovereign immunity argument fails.

Under the consular nonreviewability doctrine, "ordinarily, a consular official's decision to deny a visa to a foreigner is not subject to judicial review." *Khachatryan*, 4 F.4th at 849 (internal citation and quotation marks omitted). However, again, defendant is not, and does not argue that it is, an officer of the United States. Defendant's decision to discontinue its sponsorship of Doe's visa is not a decision by a consular official to deny a visa. Therefore, this argument, to the extent that defendant offers it, also fails.

Under the political question doctrine, a controversy "is nonjusticiable—*i.e.*, involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it[.]" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

26

Although issues of immigration and foreign policy are generally committed to the political branches, *see Fiallo v. Bell*, 430 U.S. 787, 792-96 (1977), to the extent that defendant offers a quasi-political question argument, the relevant issue here is whether defendant discriminated on the basis of disability when it decided to discontinue its sponsorship of Doe's visa.  Defendant asserts only that its sponsorship decisions are related to the United States' "[d]ecisions regarding the admission and exclusion of foreign nationals," Def. Mot. 16, but does not demonstrate how the issue of alleged disability discrimination in defendant's decisions is textually committed to a political branch or lacks judicially discoverable and manageable standards to resolve.  Because this case does not involve a political question, this argument also fails.

Turning to the substance of plaintiffs' allegations, defendant's decision to discontinue its sponsorship of Doe's visa also constitutes an adverse employment action in these circumstances.  "[T]he mere failure to sponsor or continue sponsoring a visa application generally cannot be considered an adverse employment action." *Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 44 (D.D.C. 2017) (Title VII case).  However, a decision to not sponsor or to discontinue sponsoring a visa can constitute an adverse employment action where, for example, such decision effectively amounts to a withdrawal of an offer of employment or a termination.  *See Sadare v. Bosch Auto. Serv. Sols. Inc.*, No. 19-CV-3083 (NEB/ECW), 2022 WL 2992788, at *5 (D. Minn. July 28, 2022) (finding that employer's "decision not to renew [the plaintiff]'s visa" was an adverse employment action because it "was a decision to terminate [the plaintiff]"); *Cordova v. R&A Oysters, Inc.*, 169 F. Supp. 3d 1288, 1294-95 & n.7 (S.D. Ala. 2016) (comparing revocation of a promised visa sponsorship to termination of a contract or withdrawal of an offer of employment).  Here, plaintiffs allege that without continued visa sponsorship, Doe could not live or work in the United States.  Compl. ¶¶ 16, 99.  Plaintiffs allege that the position at the new host school remained available to Doe and that Doe could only accept the position after defendant authorized her transfer request.  *Id.* ¶¶ 88, 98.  Plaintiffs thus plausibly allege that defendant's decision to discontinue its sponsorship of Doe's visa effectively constituted a decision to prevent Doe from accepting the position at the new host school and bar her from future employment opportunities at other schools.

Moreover, plaintiffs plausibly allege that defendant made this decision because of Doe's

disability. Plaintiffs allege that defendant had determined that Doe was qualified to teach when it decided to sponsor her J-1 visa and that Doe remained qualified to teach at all relevant times. *Id.* ¶¶ 39-42, 63, 67, 113. After defendant denied Doe's transfer request, Doe repeatedly offered to provide medical documentation regarding her ability to work as a teacher, but defendant refused to review such documentation. *Id.* ¶¶ 92, 98, 114. In the March 2, 2023, letter, defendant stated that it would not consider approving Doe's transfer request unless Doe "t[ook] responsibility for [her] mental health[.]" *Id.* ¶ 96 (second alteration in original) (internal quotation marks omitted). In the March 20, 2023, letter, "[d]efendant reiterated that it would not approve Doe's request to work for the new host school, informed her that it was ending her J-visa status on March 21, 2023, and asserted that she and Roe needed to leave the United States on or before April 20, 2023." *Id.* ¶ 99. Plaintiffs thus plausibly allege that but for defendant's regarding Doe as having an impairment, defendant would not have decided to end its sponsorship of Doe's visa. Accordingly, plaintiffs plausibly allege that defendant decided to discontinue its sponsorship of Doe's visa because of her disability.

Because plaintiffs plausibly allege that Doe is a qualified individual with a disability and that she suffered an adverse employment action because of her disability, Doe states a claim under the ADA and Oregon disability discrimination laws.

However, Roe does not plausibly allege that he suffered an adverse employment action because of his association with Doe. "[C]ourts have generally required, in discrimination by association cases, that a plaintiff show a causal connection between the adverse employment action and his association with a disabled person." *Kannan v. Apple Inc.*, No. 5:17-cv-07305-EJD, 2018 WL 3820857, at *6 (N.D. Cal. Aug. 10, 2018) (citing *Austin v. Horizon Hum. Servs. Inc.*, No. CV-12-02233-PHX-FJM, 2014 WL 1053620, at *2 (D. Ariz. Mar. 19, 2014); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997)). Here, in addition to defendant not acting as a covered entity with respect to Roe, nothing in plaintiffs' allegations suggests that defendant terminated Doe's visa, which consequently terminated Roe's employment, because of Roe's association with Doe. Accordingly, for this additional reason, Roe fails to state a claim of associational disability discrimination.

**E.       Supplemental Jurisdiction**

As described above, Doe plausibly states disability discrimination claims under the ADA and Oregon law.  Because Doe's state and federal claims share the same common nucleus of operative fact and would normally be tried together, they form the same case or controversy.  *See Bahrampour*, 356 F.3d at 978.  Accordingly, the Court exercises supplemental jurisdiction over Doe's related state law claim.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss, ECF [33], is GRANTED in part and DENIED in part.  Plaintiff Roe's claims are DISMISSED.  Plaintiff Doe's claims continue as described in this opinion.

IT IS SO ORDERED.

DATED this 14th day of November, 2024.

Adrienne Nelson
United States District Judge